**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | )  Case No. 1:25-cr-380-(TJK) |
| DAMION PEDDIE, | ) |
| | ) |
| Defendant. | ) |

<u>**DEFENDANT'S SENTENCING MEMORANDUM**</u>

**I. PRELIMINARY STATEMENT**

Damion Alexander Peddie, through undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing. Mr. Peddie, a 54-year-old Jamaican national who has lived the overwhelming majority of his adult life in the District of Columbia, stands before this Court having pled guilty to three counts: Unlawful Possession of a Firearm and Ammunition by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1) (Count One); Alien in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(5) (Count Two); and Illegal Reentry of Removed Aliens, in violation of 8 U.S.C. §§ 1326(a) and (b)(2) (Count Three). He accepted responsibility by pleading guilty pursuant to a written plea agreement and cooperated fully with the presentence investigation.

The advisory Guidelines range, as calculated by the United States Probation Office, is 121 to 151 months' imprisonment. The defense respectfully requests that the Court impose a sentence of **60 months'** imprisonment — a substantial sentence that is, in the words of 18 U.S.C. § 3553(a), *sufficient, but not greater than necessary*, to comply with the purposes of sentencing. As set forth below, the totality of the § 3553(a) factors — including the nature and circumstances of the offense, Mr. Peddie's history and characteristics, his role as a father and primary caretaker, his creative and literary

achievements, and the hardships attendant to his status as a deportable alien — collectively support a meaningful variance below the advisory Guidelines range.

## II. THE ADVISORY SENTENCING GUIDELINES

### A. Guidelines Calculation

The Probation Office calculated the applicable advisory Guidelines range as follows. Counts One and Two are grouped pursuant to USSG § 3D1.2(a) as arising from the same act or transaction. Count Three is treated as a separate group.

Count Group 1 (Counts One and Two — Unlawful Firearm Possession):

Count Group 2 (Count Three — Illegal Reentry):

Because both groups carry an Adjusted Offense Level of 30, a two-level increase applies under USSG § 3D1.4 (2.0 units), yielding a Combined Adjusted Offense Level of 32. After a three-level reduction for acceptance of responsibility pursuant to USSG §§ 3E1.1(a) and (b), the Total Offense Level is **29**. With a Criminal History Category of **IV** (9 criminal history points), the advisory Guidelines imprisonment range is **121 to 151 months**. The defense requests a substantial variance to 60 months for the reasons set forth herein.

### B. The Guidelines Are Advisory

Following *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, the Sentencing Guidelines are advisory, not mandatory. *Gall v. United States*, 552 U.S. 38, 49 (2007). The Court must treat the calculated Guidelines range as a "starting point and initial benchmark," but must also consider all the factors enumerated in 18 U.S.C. § 3553(a) to arrive at a sentence that is "sufficient, but not greater than necessary" to achieve the statutory purposes of sentencing. Consistent with the 2025 amendments to

the Sentencing Guidelines Manual — which collapsed the former three-step process into a streamlined two-step inquiry and eliminated most departure provisions in favor of holistic § 3553(a) analysis — courts are plainly empowered to impose a below-Guidelines sentence whenever the totality of statutory factors so warrants. The defense respectfully submits that they do so here.

### C. The Contested Two-Level Enhancement

The parties identified the two-level enhancement under USSG § 2K2.1(b)(1) — for possession of 3 to 7 firearms — as a contested sentencing issue. The Probation Office applied the enhancement and calculated a Total Offense Level of 29. The defense reserves the right to address this enhancement at the sentencing hearing. In any event, whether the Total Offense Level is 27 (without the enhancement) or 29 (with it), the defense submits that the § 3553(a) analysis compels the same result: a sentence of 60 months.

### III. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Mr. Peddie does not minimize his conduct. On August 26, 2025, federal agents executing a search warrant at his residence at 426 Taylor Street NW, Washington, D.C., discovered two firearms in his bedroom — a .22 caliber revolver bearing serial number 4717 and an unserialized 9mm Polymer 80 pistol — along with approximately seven pounds of marijuana, small quantities of fentanyl, and crack cocaine that he possessed with intent to distribute. He waived his Miranda rights, acknowledged his possession of the two bedroom firearms, and conceded that he possessed them in connection with his drug activity. He entered a timely guilty plea and accepted full responsibility. He has not obstructed justice in any respect.

The three additional firearms recovered in the first-floor dining room — an H&R .32 S&W revolver, an unserialized AR-style pistol, and a Hi-Point 9mm carbine — are items that Mr. Peddie specifically disclaims. He acknowledged only what was his. That candor is consistent throughout his engagement with law enforcement and with the Probation Office.

Mr. Peddie's involvement in the broader Knox Place narcotics conspiracy (Case No. 25-cr-241) was as a purchaser and redistributor — not as an organizer, manager, or leader. The Government did not charge him in the conspiracy case. The Information to which he pled guilty addresses only his personal conduct, and the quantities recovered at his residence are consistent with street-level redistribution, not wholesale trafficking. There is no allegation that he employed others, directed violence, or played any supervisory role in the narcotics operation.

These are serious offenses that warrant a serious sentence. But they are the offenses of a man at the retail end of a supply chain — not its architect — and they should be punished accordingly.

## IV. THE HISTORY AND CHARACTERISTICS OF DAMION PEDDIE

### A. Origins and Immigration History

Damion Alexander Peddie was born in Kingston, Jamaica. He spent the first thirteen years of his life there, largely in the care of his older sister Carol while his mother, Juneivan Douglas, worked in Washington, D.C., and his father, Clifton Peddie, served as an officer aboard a cruise ship. At approximately age thirteen, Damion relocated to join his mother in the District of Columbia — the city that would become the center of his life for the next four decades.

He was admitted to the United States as a lawful permanent resident on September 12, 1985. He attended Theodore Roosevelt High School in the District and subsequently enrolled at the University of the District of Columbia (UDC), where records confirm he completed his sophomore year in good academic standing before his studies were interrupted by the cascading consequences of early criminal conduct that led to his first deportation in December 1993.

Over the ensuing three decades, Mr. Peddie was removed from the United States on four separate occasions: December 1993, November 2000, September 2008, and most recently on March 21, 2020. Each time, he was formally advised that return without the consent of the Attorney General of the United States constituted a federal felony. Each time, he returned — driven not by contempt for the law in the abstract, but by the deeply human compulsion to be near the family, the children, and the community that constitute the entire fabric of his adult life.

Mr. Peddie has explained that he fears for his physical safety in Jamaica, where his brother's family is affiliated with a gang. His concern for his personal security upon return to Jamaica is not a fabrication; it is a consistent narrative across multiple presentence investigations spanning more than two decades. The Court need not excuse the reentries to understand what has driven them.

### B. Family and Parental Role

Mr. Peddie has been in a common-law relationship with LaShanta Smith for approximately 22 years. Together they raised a family in Washington, D.C. Their son is 16 years old and is enrolled in high school in the District. Their daughter is 18 years old and has been accepted to **seven colleges**, with plans to enroll in the fall of 2026. That

achievement is, in no small part, a reflection of the encouragement and stability her father provided even while living in the shadows of an undocumented existence.

Prior to his arrest, Mr. Peddie served as the primary caretaker for his mother, a retired correctional officer now approximately 78 years old, residing in a retirement home in Chillum, Maryland, whose health is in decline. Since her brother's arrest, his sister Sherine Robinson has borne that responsibility alone. Ms. Robinson told the Probation Office plainly: "His rap sheet is not who he is. He's a wonderful person once you sit down and talk to him." She described her brother as articulate, creative, and funny — a man who masks what he carries with humor, who has written books from the margins of society, and who now faces the possibility that his mother's last memory of him will be of a son behind bars. She has asked that this Court spare both of them that ending.

Mr. Peddie also has a 24-year-old son who is currently incarcerated at McKean FCI with a projected release date of June 2029. The generational arc of incarceration that runs through this family is not an argument for leniency without accountability; it is an argument for proportionality — for a sentence that punishes meaningfully but does not foreclose the possibility of a father's presence in the lives of children who still need him.

### C. Employment and Self-Sufficiency

Throughout the periods when Mr. Peddie resided in the United States, he supported himself through manual labor. He worked in residential construction at approximately $100 per day; in food service at a local restaurant for approximately two to three years; and in retail. He completed vocational training in sheet metal fabrication

through the Youth At Risk Program. He participated in the Marion Barry summer employment program in 1990. He worked as a salesperson at Solo Sports in Northwest Washington from 2002 until his arrest in 2003.

Mr. Peddie is not a man who has refused to work. He is a man whose immigration status foreclosed formal employment and forced him into the underground economy — a circumstance the Court can acknowledge while still holding him accountable for the choices that circumstance enabled.

### D. Physical Health

Mr. Peddie is 53 years old. Medical records from the D.C. Central Detention Facility reflect diagnoses of a pinched nerve producing chronic pain, gastroesophageal reflux disease, and an enlarged prostate for which surgery is recommended. His family history includes breast cancer, strokes, and blood clots. These conditions, while not currently debilitating, reflect the physical realities of a middle-aged man whose health will only become more demanding with additional years of incarceration. Each year of imprisonment at his age carries greater physiological cost than the last.

### V. MIRROR/MIRROR: A PUBLISHED WORK BY DAMION PEDDIE

In 2022, Damion Peddie published ***Mirror/Mirror*** — a work of literary fiction that stands as one of the most powerful pieces of evidence before this Court about who Damion Peddie truly is. The book tells, in the words of its own back cover, "the dramatic story of a father and son caught up in an inescapable web of society, friendship, and love." It explores how "the connection between them unfolds" and how "countless secrets are revealed — some of them hurt and some of them mend." At its center is "the wife and

mother, who presents the ultimate mirror/mirror as she fights to prevent old mistakes being repeated."

The back cover of the book is described by its publishers as:

*"Intelligent, wistful, thought-provoking, Mirror/Mirror tells the dramatic story of a father and son caught up in an inescapable web of society, friendship, and love. As the connection between them unfolds, countless secrets are revealed — some of them hurt and some of them mend. The glue that bonds father and son together is the wife and mother, who presents the ultimate mirror/mirror as she fights to prevent old mistakes being repeated."*

The themes of *Mirror/Mirror* are not incidental to Damion Peddie's life — they are drawn directly from it. A father and son navigating "an inescapable web" of circumstance. Old mistakes threatening to repeat themselves across generations. A woman at the center fighting to break the cycle. The PSR reflects that Mr. Peddie's own son, Damion., is currently incarcerated. The parallels between the book and Mr. Peddie's lived experience are not coincidental; they are confessional. This is a man who has looked in the mirror and tried to make sense of what he saw.

Publishing a book — sustaining the discipline to write, revise, and bring a manuscript to completion — is not the act of a man incapable of structure, purpose, or contribution. It is the act of a man with a rich interior life who has found, against formidable personal odds, a way to express it and share it with the world. Mr. Peddie's sister cited his writing as emblematic of who he is beyond his criminal record. The Probation Office itself referenced it.

The front and back covers of ***Mirror/Mirror*** are reproduced below:

**BACK COVER**



**FRONT COVER**



The cover art of *Mirror/Mirror* is itself instructive. It depicts a woman standing

thoughtfully before a mirror in which a young boy in a DC shirt sees reflected not his

own image, but the image of a grown man in an orange prison uniform — a man in

chains. It is a haunting visual metaphor for the generational transmission of incarceration, and the weight that a father's choices can place on a son's future. That Damion Peddie created this work — that he named it, illustrated it, and published it — tells the Court something that no Guidelines calculation can: that he has seen his own life clearly, that he understands its costs, and that he has tried to transform its meaning.

## VI. THE § 3553(a) FACTORS SUPPORT A SENTENCE OF 60 MONTHS

### A. Nature and Circumstances of the Offense; History and Characteristics of the Defendant — § 3553(a)(1)

The offense is serious, and Mr. Peddie does not pretend otherwise. Mr. Peddie possessed illegal firearms — including an unserialized ghost gun — in connection with the distribution of dangerous narcotics, including fentanyl. He reentered the United States without authorization after four removals. His criminal history, spanning more than three decades, includes prior convictions for drug distribution, multiple illegal reentries, use of a fraudulently obtained passport, and multiple revocations of supervised release. These facts weigh heavily, and the defense does not minimize them.

But the § 3553(a)(1) inquiry is bilateral. The Court must weigh the gravity of what Mr. Peddie did against the full measure of who he is. He is a man who came to this country as a teenager, built a family here, and — despite repeated removal — could not stay away from the only community he knows as home. He is a man who held jobs, earned his GED while incarcerated, completed vocational training, served as the primary caretaker for an aging mother, raised a daughter bound for college, authored five books, and published one. His criminal history reflects real failures. It does not capture the full person.

10

**B. The Need to Reflect Seriousness, Promote Respect for the Law, and Provide Just Punishment — § 3553(a)(2)(A)**

A sentence of 60 months — five years of federal imprisonment — is a severe and consequential punishment. For a 53-year-old man with ongoing medical conditions, a long-term partner, and children in high school and college, five years of incarceration is not a light consequence. It will cost Mr. Peddie his daughter's first years of college, his teenage son's formative high school years, and time with an elderly mother whose health is declining. A 60-month sentence reflects the seriousness of these offenses. It promotes respect for the law. The Guidelines range of 121 to 151 months — a decade or more — would punish Mr. Peddie far beyond what is necessary to achieve those goals, at enormous cost to his family and his community.

**C. Adequate Deterrence and Protection of the Public — § 3553(a)(2)(B) and (C)**

The defense does not shy from the recidivism issue. Mr. Peddie has been removed from the United States four times and has returned each time. The Guidelines enhancements applied in this case reflect precisely that pattern. But the defense submits that Mr. Peddie's repeated reentries have been driven not by indifference to deterrence, but by the gravitational pull of family — by children who needed a father, by a mother who needed a caretaker, by a city that was, in every meaningful sense, home.

A 60-month sentence — followed by deportation — represents a significant sanction. Whether any sentence will permanently deter future reentry depends on factors well beyond the Court's control: the stability of conditions in Jamaica, the health of Mr. Peddie's family, the passage of time, and his own choices. What the Court can do is impose a sentence proportionate to the offense, to the history, and to the man standing before it.

**D. Avoiding Unwarranted Sentencing Disparities — § 3553(a)(6)**

The Judiciary Sentencing Information (JSIN) data reported in the PSR reflects that, during fiscal years 2020 through 2024, the average and median sentence imposed on defendants with a Final Offense Level of 29 and a Criminal History Category of IV — after excluding substantial-assistance cases — was

**108 months**. See PSR ¶ 163. The Government's requested Guidelines sentence of 121 to 151 months thus already represents an above-median outcome for this Guidelines cell. The requested sentence of 60 months represents a below-Guidelines variance, but one rooted in the specific facts of Mr. Peddie's case, his history, and the concrete disparities in conditions of confinement he will face as a deportable alien.

**E. The Deportable Alien Variance — United States v. Smith**

This Circuit has expressly recognized that a downward variance may be appropriate where a defendant's status as a deportable alien is likely to cause a fortuitous — that is, adventitious and undeserved — increase in the severity of confinement. *United States v. Smith*, 27 F.3d 649, 655 (D.C. Cir. 1994). As a deportable alien, Mr. Peddie is ineligible for placement in a minimum-security Bureau of Prisons facility; ineligible for pre-release community confinement or halfway house placement under 18 U.S.C. § 3624(c); and ineligible for certain BOP programming available to citizen inmates. He will serve a materially greater percentage of his actual sentence in a more restrictive custodial environment than an otherwise identically situated United States citizen. The Probation Office itself flagged this issue, noting that Mr. Peddie's "status as a deportable alien may warrant a downward departure from the guidelines" and citing *Smith* directly. See PSR ¶ 162.

12

Under the 2025 Guidelines amendments — which preserve the *Smith* rationale within the Court's § 3553(a) holistic analysis — this Court retains full authority to account for the concrete sentencing disparity that Mr. Peddie's alien status will produce. The difference in severity is not speculative; it is categorical and certain and will apply for the entire duration of whatever term this Court imposes. Justice requires that this Court take it into account.

## VII. THE REQUESTED SENTENCE

For all the foregoing reasons, the defense respectfully requests that the Court impose a sentence of **60 months**' imprisonment on Counts One through Three, to run concurrently. A concurrent sentence is consistent with USSG § 5G1.2(c), which provides that when the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, sentences on all counts shall run concurrently.

As to supervised release, the defense requests that this Court decline to impose a term of supervised release, consistent with USSG § 5D1.1(c), which provides that a term of supervised release should not ordinarily be imposed on a deportable alien likely to be deported following imprisonment, absent specific findings that supervision would provide a meaningful added measure of deterrence or protection beyond the sentence of imprisonment and the deportation itself.

As to fines, the PSR reflects that Mr. Peddie has no assets and no ability to pay. The defense respectfully requests that the Court waive the fine. The mandatory special assessment of $100 per count — $300 total — is acknowledged and will be paid.

## VIII. CONCLUSION

Damion Peddie has made serious mistakes — mistakes that have carried him in and out of federal courtrooms and in and out of this country for more than thirty years. He has served real prison time. He has been deported four times and returned four times, each time drawn back by a family that needed him and a city that was home. He has, in the margins of an undocumented life, held jobs, cared for an aging mother, raised children, and written books — including one that tells, in fiction, the story that is also his own: a father and son caught in a web they did not choose, with a woman at the center fighting to keep old mistakes from being made again.

He stands before this Court at 54, in declining health, with a daughter bound for college, a teenage son still in high school, a partner of 22 years, and a mother whose time is short. The Guidelines recommend a sentence of 121 to 151 months. That sentence would consume the remainder of whatever meaningful family life Mr. Peddie has left. It is not necessary to achieve the purposes of sentencing under § 3553(a). A sentence of 60 months is sufficient to punish and sufficient to deter.

Respectfully submitted,

DAMION PEDDIE
By Counsel

/s/ Pleasant Brodnax

Pleasant S. Brodnax, III
DC Bar 416694
1701 Pennsylvania Avenue, NW
Suite 200
Washington, D.C., 20006
(202) 462-1100
pleasant@pleasantbrodnax.com

14

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of March, 2026, a copy of the foregoing Memorandum in Aid of Sentencing was filed via the Court's CM/ECF system, which transmitted electronic notice to all counsel of record.

/s/ Pleasant Brodnax

_____

Pleasant S. Brodnax, III

15