**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 25-cr-380 (TJK)** |
| | : | |
| **DAMION ALEXANDER PEDDIE,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Damion Alexander Peddie pleaded guilty to a three-count Superseding Information charging him with Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1) (Count One), Alien in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(5) (Count Two), and Illegal Re-entry of Removed Aliens, in violation of 8 U.S.C. § 1326(a) and (b)(2) (Count Three). For the reasons herein, the Government respectfully requests that the Court sentence the Defendant to 144 months of imprisonment, to be followed by three years of non-reporting supervised release.

## BACKGROUND

In the Summer of 2024, law enforcement officers with the Federal Bureau of Investigation (FBI) led an investigation into a narcotics trafficking conspiracy centered around the 2900 block of Knox Place SE. The year-long investigation culminated in the return of an eight-count indictment on August 21, 2025, in *United States v. Thomas Hancock, et al.*, 25-cr-241 (TJK). During the investigation, law enforcement identified Eric Prather as a prolific fentanyl and PCP dealer with at least one stash house at 2926 Knox Place SE. From August 2024 through July 2025, law enforcement conducted twenty controlled buys of fentanyl and PCP, eighteen of which occurred with Prather, resulting in multiple kilograms of fentanyl and PCP being interdicted in the

lead-up to a coordinated arrest operation conducted in late-August 2025.

As the investigation progressed, law enforcement identified co-defendant Thomas Hancock as a large-scale distributor of fentanyl and PCP, amongst other narcotics, in the Washington, D.C./Baltimore Metropolitan Area based in Baltimore. Hancock was the source of supply of fentanyl to Prather, vis-à-vis an intermediary, Reginald Lassiter. During court-authorized wiretaps of Hanock's telephone, as well as other investigative methods, law enforcement was able to identify other redistributors of Hancock's fentanyl, including the Defendant.

For example, on March 29, 2025, Hancock (green text bubbles) sent the below message and a video, the latter of which is omitted from this public filing, to the Defendant (grey text bubbles). In the video, a male is observed sitting in a chair and appears to be under the influence of a narcotic. Near the end of the video, the FaceTime Video interface appears, showing the Facetime Video interaction is with "Bro Lip.". In Hancock's contact list, "Bro Lip" is associated with telephone number 202-883-9369, a telephone number utilized by Lassiter.



This exchange is reasonably interpreted as follows: Hancock was showing the Defendant in the video exchange omitted from this public filing what effect his product, believed to be fentanyl based upon the quantities discussed, as well as then-active wiretap interceptions of Hancock's trafficking, has on a user. It's further believed that Hancock is providing his ratio of fentanyl and cut which has caused the user to have a strong effect, "baked."

The next month, on April 20, 2025, Hancock messaged the Defendant: "Wsup big guy how u looking". The Defendant responded with a voice recorded message. The Defendant's message included that there were "no heads around" and "nobody for the down". Interpreted, Hancock is soliciting a potential transaction with the Defendant, but the Defendant replies that he doesn't have any buyers at present for his narcotics, including "down," a common drug slang term for fentanyl.

Importantly, at the time of these communications, the Defendant had been previously removed from the United States on no fewer than five occasions, with at least four of those removals occurring pursuant to federal convictions, most recently in District of Columbia Case No. 13-cr-69. *See*, *e.g.*, the Pre-Sentence Report (the "PSR"), at ¶¶ 59, 61-63. These removals all occurred after the Defendant's 1991 drug conviction in the Superior Court of the District of Columbia for attempted distribution of cocaine. *Id*. at ¶ 58.

Despite these prior removals, the Defendant re-entered the United States again, resumed drug trafficking, and on August 26, 2025, was discovered by FBI agents in his residence as part of the coordinated arrest operation conducted in connection with the instant investigation. Specifically, on that date, law enforcement officers executed a search warrant at 426 Taylor Street NW, Washington, D.C. After entry into the building, FBI agents encountered the Defendant walking down the stairs from the second story of the residence. During the search, in the Defendant's bedroom, law enforcement found two firearms: a privately manufactured black 9mm

Polymer 80 pistol (PMF) with no serial number, and a .22 caliber revolver bearing serial number 4717, as well as assorted rounds of ammunition. Also in the Defendant's bedroom were distribution quantities and/or pre-packaged baggies of fentanyl, crack cocaine, and marijuana. The Defendant acknowledged possessing each of these two firearms in a *Mirandized* interview conducted incident to his arrest.

Separately, in the first-floor dining room of the residence, the following firearms were found: an H&R 32 S&W revolver bearing serial number AM23798; a privately manufactured AR-style firearm inside a backpack with six magazines and various types of ammunition; and a High Point 9mm carbine rifle in a cardboard box on the floor.[1]

## STATUTORY PENALTIES

The penalties for Counts 1 and 2 of the Information carry a statutory maximum penalty of 15 years imprisonment, a fine not to exceed $250,000, and a term of supervised release of no greater than three years' imprisonment. The penalty of Count 3 of the Information carries a statutory maximum penalty of 20 years imprisonment, a fine not to exceed $250,000, and a term of supervised release of no greater than three years' imprisonment.

## SENTENCING GUIDELINES

The Government concurs with the PSR that the applicable Guideline range in this case, after acceptance of responsibility, is 121 to 151 months imprisonment. *See* PSR, ¶¶ 138-39.

---

[1] The question of the possession of these weapons was an issue of anticipated dispute for sentencing. Importantly, however, the parties' plea agreement did not contemplate the two-level enhancement applicable pursuant to U.S. Sentencing Guidelines (the "Guidelines") Section 3D1.4. Thus, the Government does not pursue any enhancement under U.S.S.G. Section 2K2.1(b)(1) for any alleged possession of these three additional firearms in order to honor the contemplated applicable Guidelines range articulated in the Defendant's plea agreement.

**LEGAL PRINCIPLES**

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *United States v. Rita*, 551 U.S. 338, 348-50 (2007). The Section 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the kinds of sentences available; (4) the sentencing range established by the Sentencing Guidelines; (5) any related Sentencing Commission policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need for restitution to any victims.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 296 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory. *Booker*, 543 U.S. at 245. Nonetheless, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *See Gall*, 128 S. Ct. at 598 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). The Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions. *See Rita*, 551 U.S. at 338; *see also* United States Sentencing Comm'n, Supplementary Report on the Initial

Guidelines and Policy Statements 16-17 (1987); 28 U.S.C. § 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 438 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). In addition, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." *Booker*, 543 U.S. at 264 (the Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). Any Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by Section 3553(a)(1). The Guidelines themselves thus seek to implement—in a fair and uniform way—the offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in *Gall*. *See Gall*, 552 U.S. at 50.

## **ARGUMENT**

A sentence within the Guidelines range, specifically at 144 months of imprisonment, is appropriate in light of the seriousness of the offense. The Defendant is an unrepentant recidivist. He has been removed from the country no fewer than five previous occasions, yet remains undeterred. A significant carceral sentence is the only adequate measure of deterrence available to the Court in fashioning an appropriate sentence in this case. The Government's recommended sentence is also designed to deter others, promote respect for the law, and offer rehabilitation to the Defendant.

### 1.     The Nature, Circumstances, and Seriousness of the Offense

The criminal conspiracy in which the Defendant was implicated is incredibly serious. He is directly implicated in a fentanyl and PCP trafficking conspiracy that was responsible for the distribution of kilograms of fentanyl and PCP into the District of Columbia and elsewhere. The Defendant's participation in this fentanyl conspiracy occurred against the backdrop of a widespread, lethal drug epidemic.

According to the DEA, "Fentanyl is a Schedule II controlled substance that is similar to morphine but about 100 times more potent. . . . Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction. . . . Two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage." *See* DEA, *Facts about Fentanyl*.[2] The lethality of fentanyl is reflected in nationwide statistics: roughly 73,690 people in this country died of drug overdoses in the 12-month period ending in April 2025. *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts* (based on provisional data available as of September 7, 2025).[3] Of these deaths, roughly 42,233 (or about 57 percent) involved synthetic opioids (of which fentanyl is one). *Id.* (By comparison, in 2023, nearly 47,000 people in the United States died of firearms. *See* John Gramlich, *What the data says about gun deaths in the U.S.*, Pew Research Center (March 5, 2025)).[4] And, thanks in part to people like the defendants in this case, our community has been pummeled by fentanyl: in 2023, Washington, D.C., had an opioid overdose death rate of 49.6 people per 100,000—second among all the states and D.C. only to West Virginia. *See* KFF, *Opioid Overdose Death Rates and All Drug Overdose*

---

[2] https://www.dea.gov/resources/facts-about-fentanyl.

[3] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.

[4] https://www.pewresearch.org/short-reads/2025/03/05/what-the-data-says-about-gun-deaths-in-the-us/.

*Death Rates per 100,000 Population (Age-Adjusted)* (2023 timeframe).[5]

This conduct alone merits the Government's requested sentence. Here, though, the evidence suggests that the Defendant was acutely aware of the effects fentanyl have on members of the community. The Defendant exchanged text messages with his supplier, Hancock, making light of the apparent effects their product had on a tester (a drug addict who served as an unwitting participant in the conspiracy alleged in this investigation). Moreover, he armed himself with multiple firearms to protect the product he kept in his residence. He did all of this while residing in the country knowing he was prohibited from doing so, by virtue of his numerous prior removals. The Defendant's conduct is both dangerous and egregious.

### 2.      The Defendant's History and Characteristics

The Defendant is an unrepentant drug trafficker who refuses to change his conduct, despite numerous opportunities to do so. As a consequence of his prior convictions for illegal re-entry, the Defendant has been removed from the United States incident to federal criminal convictions on no fewer than four occasions. The Defendant was most recently removed from the United States to Jamaica by Immigration and Customs Enforcement (ICE) via a chartered flight on or about March 21, 2020, from the Alexandria, Louisiana Port of Entry.

Nevertheless, the Defendant has proved to be a talented recidivist, flouting the United States' immigration laws and continually re-entering the country despite his well-established legal prohibition from doing so. In this instance, the Defendant's pre-sentence interview with the assigned United States Probation Officer is particularly instructive. During this interview, rather than expressing remorse for his criminal conduct, the Defendant remained defiant, stating that he was "illegally deported" in December 1993 after his D.C. Superior Court drug trafficking

---

[5] https://www.kff.org/other/state-indicator/opioid-overdose-death-rates.

conviction. PSR, ¶ 93. Indeed, the Defendant even deflects blame for his present counts of convictions, reasoning that he kept firearms in his home because "Dr. Anthony Fauci 'inoculat[ed] the kids' and '[made] them violent.'" *Id*. at ¶ 100.

Put simply: the Defendant's criminal history exhibits a three-and-a-half decade commitment to recidivism, with absolutely no indicia of remorse or repentance expressed during his PSR interview. The Court should take heed of the Defendant's characteristics, in both word and deed: the Defendant will continue to illegally re-enter the country absent a significance prison sentence to deter him from doing so, and he will continue to peddle poison into the community to support himself if permitted to do so.

**3.    Other factors**

Given the catastrophic impact of drugs on our community, a sentence within the recommended Guidelines range is warranted. Too many people do not understand or fear the consequences to themselves or their community that flow from this behavior, and they must understand that their conduct is unacceptable. This is especially pronounced in the Defendant's circumstances. The Defendant was arrested, convicted, and removed from the country pursuant to enhanced criminal penalties on no less than four prior occasions as a consequence of his prior federal drug trafficking conviction. Nevertheless, he continues to recidivate, continuing to illegally re-enter, continuing to peddle drugs into the community, and continuing to demonstrate a flagrant disregard for any consequences of his conduct.

Put simply, there is no credible reason for the Court to believe that deterrence can be served in a generalized or specific sense apart from imposing a sentence within the Guidelines range. A sentence that conforms to the recommended Guidelines range is designed to deter others from making the same choice the Defendant did.

## **CONCLUSION**

For the foregoing reasons, the Government recommends that the Court sentence the Defendant within the recommended Guidelines range, to a sentence of 144 months imprisonment, followed by three years of non-reporting supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: _/s/ Matthew W. Kinskey_____
MATTHEW W. KINSKEY
Assistant United States Attorney
D.C. Bar No. 1031975
United States Attorney's Office
Violent Crime & Trafficking Offenses
601 D Street, NW
Washington, D.C. 20530